United States District Court
Southern District of Texas
**ENTERED**
January 27, 2016
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| RAY MCARTHUR FREENEY, | § | |
| | § | |
| Petitioner, | § | |
| VS. | § | CIVIL ACTION NO. 4:14-CV-373 |
| | § | |
| WILLIAM  STEPHENS, | § | |
| | § | |
| Respondent. | § | |

## MEMORANDUM AND ORDER

A jury convicted Ray McArthur Freeney of capital murder in August 2003.  Pursuant to the jury's answers to Texas' special issue questions, the trial court sentenced Freeney to death. Freeney unsuccessfully availed himself of Texas appellate and habeas remedies, raising several challenges to his conviction and sentence.

On January 26, 2014, Freeney filed a federal petition for a writ of habeas corpus. [Instrument No. 8].  Freeney raises four claims in his federal petition.  Respondent William Stephens has moved for summary judgment.  [Instrument No. 12].  Having reviewed the record, pleadings, and the law, and giving special consideration to the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), the Court finds that Freeney has not shown an entitlement to federal habeas relief.  The Court, therefore, will **grant** Respondent's motion for summary judgment, **deny** Freeney's petition, and **dismiss** this case.  The Court will not certify any issue for consideration by the Court of Appeals for the Fifth Circuit.

## BACKGROUND

The State of Texas indicted Freeney for the murders of two victims, Kirshalynne Jones and Vicky Dean, during different criminal transactions but pursuant to the same scheme or

course of conduct.  Tex. Penal Code Ann. 19.03(a)(7)(B).  Freeney provided the police with statements confessing to those murders, along with other crimes.  On direct appeal, the Texas Court of Criminal Appeals relied on Freeney's confession to describe the murders:

> [On April 18, 2002,] Freeney picked up Jones, who was working as a prostitute on Bissonnet [Avenue in Houston, Texas], and went to her motel room intending to have sex with her without paying her any money.  He subdued her and caused her to lose consciousness by placing her in a "choke hold," attempted to have vaginal intercourse with her, stabbed her in the chest and neck when she regained consciousness, and then forced her to perform oral sex on him.  Four days later, he picked up Dean on Forum West, which was located almost directly behind the motel where he killed Jones.  He brought Dean back to his apartment, believing that she was a prostitute and intending to have sex with her without paying her any money.  He attempted to subdue Dean by giving her a "sleeping aid," stabbed her in the neck, torso, face, and upper extremities, attempted to have vaginal intercourse with her, and had her perform oral sex on him.  Freeney was arrested three days later on Bissonnet, the same street where he had picked up Jones.

*Freeney v. State*, No. AP-74,776, 2005 WL 1009560, at *5 (Tex. Crim. App. Apr. 27, 2005).

The trial court appointed Robert Loper and Layton Duer to represent Freeney.[1]  With his detailed confessions to the two murders, the defense faced a difficult task in preparing for trial. The defense retained an investigator and a separate mitigation specialist. In the course of preparing for trial, the defense also retained a number of experts, including psychologists Dr. Daneen Milan and Dr. Cecil Reynolds.

At trial, the prosecution relied heavily on Freeney's confession to the two murders.  In addition, the prosecution presented forensic evidence and witness testimony to establish

---

[1]    Unless necessary to identify one of the attorneys, the Court will collectively refer to the attorneys who represented Freeney at trial as "trial counsel."

Freeney's culpability for the crimes.  The defense argued that Freeney could not be convicted of capital murder as set out in the indictment because the murders did not occur within the same course of conduct.  As an ancillary issue, the defense argued that Freeney did not voluntarily and knowingly confess.  The jury convicted Freeney of capital murder.

A Texas jury decides a capital defendant's sentence by answering two special issue questions:

### Special Issue No. 1

Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant, Ray McArthur Freeney, would commit criminal acts of violence that would constitute a continuing threat to society?

### Special Issue No. 2

Do you find from the evidence, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, Ray McArthur Freeney, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

Clerk's Record at 651-52.[2]

The prosecution presented an imposing case for a death sentence.  The prosecution called witness after witness to show that Freeney's violent behavior escalated over the years.  In addition to the brutality of the two murders for which the jury had already convicted Freeney, jurors learned that Freeney admitted to raping two other prostitutes around the same time. Freeney also confessed that he had broken into a woman's apartment, choked her into

---

[2]     The state court proceedings in this case resulted in a voluminous record.  The Court will cite the transcript containing trial court motions and docket entries as Clerk's Record at ___.  The reporter's record containing the trial court proceedings will be cited as Tr. Vol. ___ at ___.  The Court will refer to the record from Freeney's state habeas proceedings as State Habeas Record at ___ and from the supplemental record created on state habeas review as Supp. State Habeas Record at ___.

unconsciousness, threatened her with rape, and then stabbed her several times. The State presented testimony showing Freeney's violent behavior while incarcerated pending trial. Freeney was a "constant discipline problem" in jail. Tr. Vol. 21 at 59-60. Freeney hit a guard, threatened to fight and sexually assault guards, masturbated in front of a guard that he threatened to sexually assault, fought another inmate, possessed a weapon, threw urine on a jail worker, and damaged jail property.

The defense responded by calling eight witnesses, including two mental-health experts. Trial counsel later described the defense's strategy in calling punishment witnesses: "These witnesses were called to show that [Freeney] never exhibited violent or criminal behavior; that [Freeney] was abused as a child; that he was a good normal kid; that they could not believe he would have committed the offense; that he was a loving father; and that he had a mental illness." State Habeas Record at 241. The jury, nonetheless, answered Texas' special issue questions in a manner requiring the imposition of a death sentence.

Freeney raised sixteen points of error in the Texas Court of Criminal Appeals. In an unpublished opinion issued in 2005, the Court of Criminal Appeals denied relief. *Freeney v. State*, No. AP-74,776, 2005 WL 1009560, at *5 (Tex. Crim. App. Apr. 27, 2005).

Freeney filed a state application for habeas relief during the pendency of his direct appeal. As the Court will describe at greater length below, the lower state habeas court entered an initial recommendation, but the Court of Criminal Appeals subsequently remanded the case for additional review. The lower court supplemented its findings and conclusions, leading to the Court of Criminal Appeals' denial of habeas relief in 2014. Federal review followed.

**FREENEY'S FEDERAL CLAIMS AND THE APPLICABLE STANDARDS OF REVIEW**

Freeney raises four claims in his federal petition for a writ of habeas corpus:

1.    Trial counsel provided ineffective representation under *Strickland v. Washington*, 466 U.S. 668, 686 (1984), in the investigation and presentation of mitigating evidence.

2.    The state court's adjudication of Freeney's *Strickland* claim was unreasonable in its application of the law and facts.

3.    Texas' prohibition on informing jurors about the effect of jury deadlock prevents full consideration of mitigating evidence.

4.    Texas's "12-10 Rule" violates the Constitution.

Respondent moves for summary judgment.   Insofar as they are consistent with established habeas practice and procedure, the Federal Rules of Civil Procedure apply to habeas cases.  *Se*e Rule 11 of the Rules Governing Section 2254 Cases.  "As a general principle, Rule 56 of the Federal Rules of Civil Procedure, relating to summary judgment, applies with equal force in the context of habeas corpus cases."  *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000). However, if the inmate has presented his federal constitutional claims to the state courts in a procedurally proper manner, and the state courts have adjudicated their merits, AEDPA provides the predicate standards for reviewing habeas claims.

"[A] habeas petitioner has the burden under AEDPA to prove that he is entitled to relief." *Montoya v. Johnson*, 226 F.3d 399, 404 (5th Cir. 2000); *see also DiLosa v. Cain*, 279 F.3d 259, 262 (5th Cir. 2002).  A petitioner cannot meet this burden by merely alleging constitutional error. Instead, "focus[ing] on what a state court knew and did," *Cullen v. Pinholster*, ___ U.S. ___, 131 S. Ct. 1388, 1399 (2011), an inmate must show that the state court's adjudication of the alleged constitutional error "was 'contrary to, or involved an unreasonable application of, clearly established Federal law.'"  *Berghuis v. Thompkins*, 560 U.S. 370, 380 (2010) (quoting 28 U.S.C.

§ 2254(d)(1)); *see also Thaler v. Haynes*, 559 U.S. 43, 47 (2010); *Bell v. Cone*, 535 U.S. 685, 698 (2002); *Early v. Packer*, 537 U.S. 3, 7-8 (2002); *Williams v. Taylor*, 529 U.S. 362, 413 (2000). AEDPA also affords significant deference to a state court's resolution of factual issues. Under 28 U.S.C. § 2254(d)(2) "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding[.]" *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). A federal habeas court must presume the underlying factual determinations of the state court to be correct, unless the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Miller-El*, 537 U.S. at 341; *Young v. Dretke*, 356 F.3d 616, 629 (5th Cir. 2004) ("As a federal habeas court, we are bound by the state habeas court's factual findings, both implicit and explicit.").

## ANALYSIS

### I.     Failure to Investigate and Present Mitigating Evidence (claims one and two)

In his first claim, Freeney asserts that trial counsel's representation fell below the constitutional requirements set out in *Strickland v. Washington*, 466 U.S. 668, 686 (1984). Freeney's second claim argues that the state court's adjudication of his *Strickland* claim merits habeas relief under AEDPA's demanding standards. The Court will consider Freeney's first two claims together.

Under *Strickland*'s two-pronged test, a criminal defendant's Sixth Amendment rights are "denied when a defense attorney's *performance* falls below an objective standard of reasonableness and thereby *prejudices* the defense." *Yarborough v. Gentry*, 540 U.S. 1, 3 (2003) (emphasis added); *see also Rompilla v. Beard*, 545 U.S. 374, 387 (2005); *Wiggins v. Smith*, 539

U.S. 510, 520 (2003).  A capital defense attorney carries a heavy burden in preparing to defend against a death sentence.  *See Florida v. Nixon*, 543 U.S. 175, 191 (2004).  Constitutional and professional standards guide trial counsel's search for circumstances that may militate for a life sentence.  Although the Constitution does not "require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be," an attorney must still employ "reasonable professional judgment" in defending against a death sentence.  *Wiggins*, 539 U.S. at 533-34.  Defense attorneys must deeply probe a defendant's background, extensively exhaust various avenues of investigation, and seriously consider potential mitigating themes.  *See Neal v. Puckett*, 286 F.3d 236, 236-37 (5th Cir. 2002).

Before turning to Freeney's federal *Strickland* claims, the Court will review the evidence he submitted at trial and on state habeas review.

### A.      The Evidence Presented in the Punishment Phase of Trial

Counsel called eight witnesses on Freeney's behalf at the punishment stage of trial: Dr. Dennis Longmire, Dr. G.K. Ravichandran, Leon Dwight Bey, Kobina Bryant, Cassandra Rouse, Lisa Angelle, Helen Young, and Dr. Daneen Milam.  The defense first called Dr. Longmire, a professor from Sam Houston State University with expertise in the procedures used in Texas prisons.  Dr. Longmire testified that, because of the prison classification system and the statistical fact that inmates convicted of capital murder are less likely to commit violent acts, someone with Freeney's background would have a low possibility of posing a threat of future danger while incarcerated.

Freeney's long-time psychiatrist Dr. G.K. Ravichandran testified that Freeney had been his patient since suffering a psychotic break while in the National Guard.  Dr. Ravichandran

testified that Freeney was schizophrenic and required extensive medication. Freeney also suffered from depression and had symptoms of bipolar disorder. Dr. Ravichandran opined that Freeney was not malingering. On cross-examination, Dr. Ravichandran testified that he did not believe that Freeney posed a danger to anyone.

Leon Bey, a Harris County Sheriff's deputy who had known Freeney for several years, testified that Freeney told him that he had been abused as a child. Mr. Bey described Freeney as an unstable loner and introvert. Mr. Bey did not know Freeney to have been involved in criminal acts or to have been violent.

Kobina Bryant had known Freeney since childhood. Freeney's violent behavior was inconsistent with the person she knew before he entered the military. When Freeney returned from National Guard duty, he did not care about his appearance and had become a paranoid loner who at times would not act rationally.

Casandra Rouse had known Freeney for two decades. Ms. Rouse described Freeney as being quiet, shy, and polite until he entered the National Guard. Subsequently, Freeney's behavior and demeanor changed and he became aggressive, especially when not on his medication. Still, Ms. Rouse testified that Freeney was a loving father to his young son.

Lisa Angelle, who also had known Freeney since he was nine or ten years old, testified that he had been a friendly, caring, quiet child. She explained that Freeney became withdrawn, had poor grooming, and exhibited changed behavior after his National Guard duty.

Freeney's mother Helen Kelly Young testified that he had been a quiet, normal child. While she was a strict parent, Freeney was never outspoken, was not aggressive, and never posed a serious discipline problem. As with the other witnesses, Mrs. Young opined that Freeney's

behavior changed dramatically after entering National Guard service.  Mrs. Young described how Freeney was hospitalized for schizophrenia during his National Guard duty after he ran onto a shooting range.  Mrs. Young explained that Freeney received a medical discharge following the shooting range incident.  After leaving the hospital Freeney heard voices telling him to kill himself.  Freeney said he could see the devil and he believed that he was Jesus.  His readmission to the hospital resulted in prescription of medication for his mental illness.  Mrs. Young testified that Freeney did well while on his medication.

Dr. Daneen Milam, a neuropsychologist, performed a number of evaluations, reviewed records, and interviewed people who knew Freeney.  Dr. Milam believed that Freeney's childhood "was pretty okay."  Freeney and essentially agreed with Dr. Ravichandran's diagnosis of schizophrenia and major depression following his psychotic break in the National Guard.  Dr. Milam testified that Freeney could control his schizophrenia and auditory hallucinations with medication.   Freeney, however, had been off his medication for some time before the capital murders.  Dr. Milam also testified that the effects of schizophrenia could render a person's actions involuntary.

The State then called rebuttal witnesses.  A National Guard officer testified that she thought Freeney was only joking during the psychotic break and, in fact, Freeney told her that he was "only playing."  Another officer testified that Freeney had carved the word "death" into his chest.  Finally, the State called a witness to describe the violence that inmates could commit even when in a highly structured environment.

**B.      Freeney's State Habeas Claim**

In his state habeas application, Feeney faulted trial counsel for not "interview[ing] or order[ing] the interview of Mr. Freeney's family members, friends, or paramours.  Trial counsel conducted an investigation limited to interviews with persons that Mr. Freeney's mother supplied. Trial counsel did not explore all avenues leading to relevant facts to the punishment of Mr. Freeney."   State Habeas Record at 6-7.   Freeney specifically faulted counsel for not interviewing and calling the following witnesses: his brothers, Patrick Reese and Jesse Kelly Jr.; close family friend Toshie Cherie Lockridge; the mother of his first child, Shavonnie McIntyre; his aunt, Trinan Miller; and his stepfather, Johnny Ray Reese, and his stepfather's wife, Anita Reese. Freeney provided affidavits to substantiate what testimony each of the uncalled witnesses could have provided.   Taken cumulatively, Freeney describes the information in the habeas affidavits as follows:

> Freeney and his brothers were exposed to incredible emotional and physical abuse by their mother; that Freeney was told at age five that the man he thought was his father was not; that Freeney's mother assaulted Freeney by hitting him in the head with a can of food, an offense for which she was criminally charged and convicted; that Freeney was often exposed to domestic violence between Freeney's mother and her husbands; that Freeney was exposed to numerous short term and unstable relationships his mother had with men; that Freeney may have tried to commit suicide as a child; that Freeney was abandoned by his mother and left for periods of time with his maternal grandmother; that Freeney's maternal grandmother was physically and emotionally abusive to Freeney and his siblings; and that Freeney's abandonment by his mother exposed him to being sexually assaulted by his uncle while living with his maternal grandmother; and that Freeney became increasingly sexually aggressive after his psychotic break.

[Instrument No. 8 at 14-15].

With the information in the habeas affidavits, Freeney argued on state habeas review that "the experts that testified at Mr. Freeney's trial would have been able to explain and mitigate the offenses Mr. Freeney committed."   State Habeas Record at 7.  Dr. Milam and Dr. Reynolds provided affidavits specifying that, if they had the information contained in the habeas affidavits before trial, they would have been able "to explain the impact of Mr. Freeney's dysfunctional and abusive childhood, his mental illness, and his neurological deficits in the promoting the offense." State Habeas Record at 7.

Trial counsel Mr. Duer provided an affidavit affirming that counsel had "interviewed all possible defense witnesses on numerous occasions to discuss trial strategy and review possible testimony of these witnesses. All family witnesses who were available and willing to testify and whose testimony we determined would be helpful in Mr. Freeney's defense were interviewed and presented at trial." State Habeas Record at 236-37.  Trial counsel Mr. Loper subsequently provided a detailed affidavit.  In addition to providing more information about the investigation, trial counsel clarified that he prepared his affidavit "for the most part from memory" because he did not have a copy of the trial file.  State Habeas Record at 243.

The parties submitted proposed findings of fact and conclusions of law.  The lower habeas court entered detailed factual findings regarding trial counsel's performance with regard to each habeas affiant.  Taken together, the lower court's findings recognized that the habeas affiants could have provided some beneficial information for the defense.  The state habeas court, however, found that "[a] reasonable attorney could have avoided presenting the testimony" of each affiant.  State Habeas Record at 275-82.  The state habeas court found that some common factors detracted from the usefulness of the testimony in their affidavits.  All but one of the habeas affiants included information in their affidavit that were "personal to" the affiant.  The

lower court observed that "incidents and feelings not directly related to [Freeney] are of minimal probative force to the issue of [Freeney's] moral blameworthiness." State Habeas Record at 274, 275, 277, 278, 279, and 280.[3]   While providing more specificity, some of the information was merely cumulative of trial testimony, including with regard to physical and sexual abuse Freeney suffered as a child. State Habeas Record 275, 276, 277, 280, 281-82. The state habeas court found that testimony painting Freeney's mother in a negative light conflicted with, and would have undermined, the testimony adduced at trial. State Habeas Record at 275, 276, 278, 279, 282.

The state habeas court also found specific reasons to find that a reasonable attorney would not have called some of the affiants as punishment witnesses. Jesse Kelley Jr.'s testimony would have exposed the fact that he himself had been sexually abused by Freeney. State Habeas Record at 276. Patrick Reese included much hearsay and speculation in his affidavit.  For example, he did not possess first-hand knowledge that Freeney had been abused by his uncle and he only speculated that Freeney had attempted suicide. State Habeas Record at 274.  The state habeas court viewed Johnny Ray Reese's affidavit "with considerable skepticism given that he is clearly angry with [Freeney's] mother over possible infidelity within their relationship and a custody battle over their son, Patrick Reese." State Habeas Record at 280.  The same bias extended to the affidavit provided by Mr. Reese's wife. State Habeas record at 281.

Most importantly, the habeas affidavits included much information that would have been detrimental to the defense.  This information included that, as a teenager, Freeney physically fought with his mother "like someone on the street"; he was not a good role model to his brothers; he was shiftless and unhelpful; he had much "anger and hatred" in him; he beat his

---

[3]     Only Shavonnie McIntyre did not include information directly unrelated to Freeney.

brothers; he had been sexually aggressive toward women for some time; he had viewed pornography for many years; he was always in trouble as a child; he had been suspended from school for fighting; his "response to everything was to hit"; he expressed a desire to kill his mother; he had been inappropriately sexually suggestive to a long-time family friend; he ran around with "street corner girls"; he threatened a man with a knife; and that he wrote negative, disturbing, and offensive letters while incarcerated before trial. State Habeas Record at 274, 276, 277, 281. The affiants' testimony would have contradicted the defense's efforts to show that Freeney had been a quiet, non-violent person before his psychotic break by demonstrating his long-standing violent character. State Habeas Record at 274, 276, 277.

The lower habeas court concluded that counsel did not perform deficiently because Freeney had not told the defense team about the information contained in the habeas affidavits; the double-edged nature of the information could have prompted a reasonable attorney not to call the witnesses; some of the affiants lacked credibility; and, even if trial counsel had interviewed the witnesses, a reasonable attorney still could have chosen to present the same defense. State Habeas Record at 292-93. Additionally, given the overwhelming aggravating evidence, and in light of the double-edged, cumulative, or specious nature of the affidavit testimony, any deficiency by trial counsel did not prejudice the defense. State Habeas Record at 294. The lower habeas court recommended that the Court of Criminal Appeals deny habeas relief.

The Court of Criminal Appeals, however, ordered additional inquiry. On March 20, 2013, the Court of Criminal Appeals remanded the case with precise instructions:

> We are not able to determine from this record (1) whether [Freeney's] family members and friends who now have provided affidavits were available and willing to testify at the time of trial; (2) whether anyone from the defense team attempted to contact any

of these witnesses; (3) the nature and extent of any efforts to contact them; (4) if no one from the defense team contacted them the reasons why they were not contacted; and (5) if anyone contacted them the results of that contact.

Supp. State Habeas Record at 5. The appellate court specified that "the trial court shall determine whether [Freeney's] family members and friends who now have provided affidavits were available and willing to testify at the time of trial, and if so, whether anyone from the defense team attempted to contact any of them before trial." Supp. State Habeas Record at 5. The Court of Criminal Appeals instructed the lower court "to resolve the factual issues in any manner the court deems appropriate, including requiring affidavits, depositions, interrogatories, and evidentiary hearings." Supp. State Habeas Record at 5-6.

The Court of Criminal Appeals required that "[t]he issues shall be resolved within 90 days," thus requiring all factual development and lower-court adjudication to finish by June 18, 2013. Supp. State Habeas Record at 6. The lower court, however, would seek two extensions from the Court of Criminal Appeals, resulting in a final date of December 16, 2013.

On July 12, 2013, the trial court ordered Freeney's attorneys to provide trial counsel with a copy of his trial file in this case. The trial court also ordered trial counsel to provide an affidavit consistent with the Court of Criminal Appeals' remand order within twenty-one days of receiving the trial file. Supp. State Habeas Record at 24. The trial court ordered the parties to provide proposed findings and conclusions within twenty-one days of the affidavits. Supp. State Habeas Record at 24.

On September 1, 2013 the final trial file was provided to trial counsel. The lower court ordered trial counsel to provide an affidavit by October 14, 2013. Supp. State Habeas Record at

29-31.  The lower court also requested that the state habeas affiants provide affidavits answering two questions:

1. Were you available and willing to testify at the trial on July 28, 2003 through August 29, 2003 in the case of The State of Texas vs. Ray McArthur Freeney?

2. If so, did any member of the defense team attempt to contact you before trial?

Supp. State Habeas Record at 30.

Freeney filed an *ex parte* motion for investigative assistance in the lower court on April 29, 2013.  Supp. State Habeas Record at 16-18.  Freeney filed a second motion on October 3, 2013.  Supp. State Habeas Record at 40.  The trial court did not authorize funds for investigative assistance.

On November 29, 2013, Freeney filed affidavits from Patrick Reese, Shavonne McIntyre, Johnny Ray Reese, and Anita Reese.  Supp. State Habeas Record at 46-68.  Freeney did not include a new affidavit from Jesse Kelly Jr. because he had affirmed that he was "never interviewed or contacted by defense counsel in his original affidavit . . . ."  Supp. State Habeas Record at 46.  Freeney did not include affidavits from Toshie Lockridge and Trinan Miller, claiming that the denial of investigative funds prevented him from establishing contact with them.  State Habeas Record at 46.  Otherwise, the new affidavits claimed that trial counsel had not contacted the affiants.  Supp. State Habeas Record at 48, 55, 58, 62.  Johnny Ray Reese and Anita Reese both said that they would have been able to testify at trial.  Patrick Reese said that he was serving in the military and was stationed out of the country at the time of trial, but "would have been available to testify telephonically . . . ."  Supp. State Habeas Record at 48.  Ms. McIntyre also said that she would have been available to testify by telephone. Supp. State

Habeas Record at 55.  The affidavits did not include any new information or introduce new mitigating circumstances.

Trial counsel Mr. Loper signed a new affidavit on December 2, 2013.  Supp. State Habeas Record at 70-74.  Freeney was served with the affidavit on December 4, 2013. [Instrument No. 12, Ex. B].  Mr. Loper explained that possessing the trial file allowed him to discern what information he, the mitigating specialist, and the trial investigators developed before trial.  In doing so, trial counsel provided specific reasons for not calling each habeas affiant at trial.  Trial counsel disputed the credibility of some affiants because they claimed that the defense had not spoken with them when, in fact, they had been interviewed before trial. Also, some of the information the affiants provided conflicted with the trial record, was inconsistent with what Freeney or others had told them, or was proven false by official records. Trial counsel repeatedly expressed concern that any testimony from the habeas affiants would have shown that Freeney had a life-long, and escalating, tendency toward violence and sexual aggression.  In sum, trial counsel provided a basis to the lower court to find no *Strickland* deficient performance or actual prejudice with regard to each habeas affiant.

Respondent submitted proposed findings and conclusions on December 9, 2013.  Supp. State Habeas Record at 111.  Freeney did not submit anything before the lower court signed the supplemental findings and conclusions on December 10, 2013.  Supp. State Habeas Record at 110.  The renewed findings recognized that most of the habeas affiants indicated that they would have been able to testify, in person or telephonically, at trial.  Supp. State Habeas Record at 101-02.  The renewed state habeas findings reiterated all the findings of fact relating to the mitigating-evidence claim, except where a finding was contracted by the new affidavits showing that witnesses could have testified at trial.  Supp. State Habeas Record at 102, 103, 105.  Given

16 / 30

the narrow issue remanded by the Court of Criminal Appeals, the lower court focused on trial counsel's performance, adopting the earlier findings and conclusions on *Strickland* prejudice.

The state habeas court found Mr. Loper's affidavit credible.  Supp. State Habeas Record at 106.  The state habeas reiterated, and placed emphasis on, the fact that Freeney "told the trial team his mother did not abuse him . . . and that [his mother] denied abusing [him]."  Also, trial counsel interviewed "several individuals close to [Freeney's] family . . . [who] said [she] was a good mother and did not mistreat her children."  Supp. State Habeas Record at 107.  In addition, and based on trial counsel's affidavit, the lower habeas court also entered supplemental findings that provided new reasons for which counsel did not provide ineffective representation in failing to call each habeas affiant, to wit:

> Patrick Reese had been serving abroad in the military and thus counsel was not ineffective for not interviewing him or calling him as a witness.  In addition, none of the witnesses trial counsel interviewed gave any reason to believe that Mr. Reese could provide information about physical abuse such as he had provided in his affidavit.  Supp. State Habeas Record at 102.

> Trial counsel had applied for and received a subpoena for Jesse Kelley Jr.  The subpoena was served on Mr. Kelley.  The state habeas court found it "improbable that the trial team would have subpoenaed Kelley Jr. . . . and told him that he might be a character witness without having spoken to him about what he could testify to . . . ."  Because trial counsel's records showed that they had interviewed Mr. Kelley twice, the state habeas court found it "incredible . . . that the trial team did not contact Kelley Jr., as he asserts."  Finally, because of Freeney's sexual abuse of Mr. Kelley and the lack of pretrial evidence about physical abuse by their mother, trial counsel was not deficient for not putting Mr. Kelley on the stand.   Supp. State Habeas Record at 102-03.

The defense explored potential testimony from Trinan Miller. The defense obtained information before trial that contradicted her habeas affidavit. Information showed that Freeney's mother did not assault him. CPS records verified that the children were not removed from the home of Freeney's mother. Also, Casandra Rouse told the defense that Mrs. Miller was jealous of Freeney's mother and "was a liar." Supp. State Habeas Record at 104.

The defense had obtained testimony that contradicted Toshie Lockridge's description of Freeney's mother's problems with anger and abuse. One witness, in fact, told the defense that Freeney's mother treated her children "like gold." Also, trial counsel's failure to call Ms. Lockridge as a witness was "reasonable given that Lockridge was the daughter of [his mother's] friend, i.e. a rather distant connection to [him], and none of the witnesses . . . indicated that there was any physical abuse growing up in [the] household [of Freeney's mother]." Supp. State Habeas Record at 104-05.

Both Johnny Ray and Anita Reese had no contact with Freeney since he was a baby. Their paucity of personal knowledge, and the fact that what they did say contradicted other information obtained by counsel, foreclosed a finding of *Strickland* deficient performance. Supp. State Habeas Record at 105.

Shavonnie McIntyre's testimony was "incredible" because, despite her testimony that the defense never contacted her, trial records showed that the trial investigator interviewed her. In addition, Ms. McIntyre provided information that was inconsistent with, or damaging to, the defense's chosen strategy. Supp. State Habeas Record at 106.

In addition, the state habeas court emphasized that Freeney had denied that his mother had abused him, those close to the family did not describe any abuse, and official records undercut the allegations about abuse. Supp. State Habeas Record at 107. With the exception of those relating to the available of witnesses to testify, the state habeas court also adopted its prior

legal conclusions.  Supp. State Habeas Record at 107.    The lower court recommended that the Court of Criminal Appeals deny habeas relief.

Freeney did not file any objections in the Court of Criminal Appeals.  The Court of Criminal Appeals agreed with the lower court's recommendation.  The Court of Criminal Appeals adopted the lower court's supplemental findings and denied relief.  *Ex parte Freeney*, No. WR-78,109-01 (Tex. Crim. App. Aug. 20, 2014).

### C.    Freeney's Federal Claim and AEDPA

Freeney's federal petition renews his challenge to trial counsel's punishment-phase preparation and presentation of evidence.  Freeney separates this claim into two grounds for relief.  In his first claim, Freeney argues that this Court should not base its review of the state-court decision on AEDPA's highly deferential standards.  Freeney contends that the trial court "deprived him of a full and fair opportunity to adjudicate his *Strickland* claim in state court" and "violated the tenets of due process" by not authorizing "any opportunity to respond to the evidence the court relied on" or "receive evidence" from certain witnesses.  [Instrument No. 8 at 27].   Freeney's second ground for relief argues that he has nonetheless met AEDPA standards for habeas relief.

Contrary to Freeney's claim, AEDPA governs this Court adjudication of the state court's legal decision and factual findings.  While Freeney complains that he did not have the opportunity to submit his own proposed findings on state habeas, section 2254(d)(1) places no

qualifier on its application to any claim "adjudicated on the merits." The statute contains no requirement that the state adjudication proceed under any certain set of circumstances.[4]

Freeney likewise alleges that insufficient opportunities for factual development or procedure deprived him of a full or fair state hearing, disentitling any state factual findings to deference under section 2254(e)(1). The Fifth Circuit has repeatedly held that "a full and fair hearing is not a precondition to according § 2254(e)(1)'s presumption of correctness to state habeas court findings of fact." *Valdez v. Cockrell*, 274 F.3d 941, 951 (5th Cir. 2001); *see also Wiley v. Epps*, 625 F.3d 199, 207 (5th Cir. 2010); *Morrow v. Dretke*, 367 F.3d 309, 315 (5th Cir. 2004); *Bass v. Dretke*, 82 F. App'x 351, 354 (5th Cir. 2003). Accordingly, the Court rejects Freeney's proposal in his first claim to review his arguments independent of AEDPA standards.

The state court considered the merits of Freeney's *Strickland* claim. Despite Freeney's protestations to the contrary, the state court applied the correct legal standards to his claims. Accordingly, "[t]he pivotal question" under AEDPA review "is whether the state court's application of the *Strickland* standard was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). This requires an inmate show "more than incorrect or erroneous." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Richter*, 562 U.S. at 101 (citation and internal quotation marks omitted).

---

[4] In a limited range of cases in which there is "a significant substantive liberty interest [at stake]"—primarily when the petitioner invokes claim that he is constitutionally "ineligible for the death penalty"—a "set of core procedural due process protections" exist, the absence of which deprive the state court's decision "the deference normally due." *Tercero v. Stephens*, 738 F.3d 141, 148 (5th Cir. 2013) (quotations omitted); *see also Panetti v. Quarterman*, 551 U.S. 930, 953 (2007); *Blue v. Thaler*, 665 F.3d 647, 656–57 (5th Cir. 2011); *Wiley v. Epps*, 625 F.3d 199, 207 (5th Cir. 2010); *Rivera v. Quarterman*, 505 F.3d 349, 358 (5th Cir. 2007). The Fifth Circuit, however, has never extended this unique exception to a run-of-the-mill *Strickland* claim. At any rate, even if Freeney's arguments carried some weight, the state habeas court decided Freeney's claim on both *Strickland* prongs. Freeney had adequate opportunities before, and the record did not materially change after, remand to make his arguments involving *Strickland* prejudice. Nevertheless, this Court's discussion of *Strickland* prejudice would not change under a *de novo* review.

This is not a case where the state court made an "error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *White v. Woodall*, __ U.S. ___, ___, 134 S. Ct. 1697, 1699 (2014). The record showed that trial counsel engaged in a thorough investigation and was well-acquainted with various mitigation theories. Trial counsel sought the aid of investigators to defend against a highly aggravating case. Both the investigator and trial counsel spoke with many people and developed a significant amount of evidence. Trial counsel secured the assistance of mental-health experts. The record verifies that trial counsel investigated several leads and pursued different avenues of mitigating information. Drawing on various sources, trial counsel put on a robust case for jurors to answer the mitigating special issue in a manner favorable to their client.

Trial counsel's interaction with Freeney himself, defense interviews with various witnesses, and other investigation did not turn up anything that would lead to some of the information contained in the habeas affidavits. Supp. State Habeas Record at 107. Even so, trial counsel provided specific and defensible reasons for not adducing the mitigating evidence provided by the habeas affiants. With that record, the state courts endorsed trial counsel's decisions, particularly because the chosen strategy averted much negative information from coming before jurors. A reasonable attorney could avoid putting before a jury information that his client's aggressive tendencies extended into his childhood, including evidence that he was physically abusive to his mother and brothers, frequently fought with others, wanted to kill his mother, and was sexually aggressive towards women. State Habeas Record at 292.

In addition to inserting much negative information about Freeney into the record, the habeas affidavits do not necessarily undercut the reasonableness of the chosen punishment case. As the state habeas court observed, the habeas affidavits may have allowed the defense to choose

a different avenue, but that does not necessarily mean trial counsel chose the wrong one.  The state habeas court observed that "[c]hoosing one plausible defensive path is not deficient conduct," especially where "[t]he defensive theme that [Freeney] was a law-abiding, well-mannered child who eventually had a psychotic break in the National Guard where he was diagnosed with schizophrenia" was "equally valid and, arguably, better" that contained in the habeas affidavits: Freeney "was beaten by his mother, violent as a child, and sexually aggressive which explains his later behavior as seen through his schizophrenia."  State Habeas Record at 292.

In finding no constitutional deficiency in counsel's representation, the state courts honored *Strickland*'s strong presumption that counsel performed competently.  *Strickland*, 466 U.S. at 689.  Indeed, the state habeas court "required not simply to give [Freeney's trial] attorneys the benefit of the doubt, . . . but to affirmatively entertain the range of possible reasons [Freeney's trial] counsel may have had for proceeding as they did."  *Pinholster*, 563 U.S. at 196 (internal quotation marks and citation omitted).  With the contradictions in the record, the sharply aggravating nature of the accompanying evidence, the specious nature of some new information, and the other concerns, this is not a case in which "fairminded jurists could disagree on the correctness of the state court's decision" relating to trial counsel's performance. *Harrington*, 562 U.S. at 88

Crucially, Freeney has not established *Strickland* prejudice.  Freeney has adduced evidence that could provide jurors a sympathetic context in which to consider some facets of his life.  "The fact that the new evidence would have given [the petitioner] a stronger defense or that the case would have been argued differently does not necessarily mean that the outcome would have been different."  *Williams v. Thaler*, 684 F.3d 597, 604-05 (5th Cir. 2012).  Outstripping the

effect of his new evidence, however, would be the danger of showing that Freeney's violence was not of recent vintage, emerging only after a psychotic episode during military service. *See Wong v. Belmontes*, ___ U.S. ___, 130 S. Ct. 383, 386 (2009) (instructing that "it is necessary to consider all the relevant evidence that the jury would have had before it" if trial counsel "had pursued the different path" suggested in state habeas court). Freeney's new evidence extends his violence and sexually aggressive tendencies deep into his childhood. The possibility that a relative sexually abused Freeney was not confirmed, but his own sexual abuse of a family member would be. The contradictory evidence about his mother's physical abuse would be offset by testimony that he physically fought with her as a teenager. Testimony about his anger and turbulence would negate testimony about Freeney's good nature as a child.

Aside from the contradictions and additional aggravation, the extremely aggravating case against Freeney would dampen any mitigating effect of the new evidence. *See Vasquez v. Thaler*, 389 F. App'x 419, 428 (5th Cir. 2010) ("Naturally, the power of the newly amplified case to mitigate a jury's selected punishment will be contingent on other factors in the case, such as the circumstances of the crime."). Here, the brutality of Freeney's actions in the weeks before his arrest—including the two murders for which the jury convicted Freeney—conclusively foreclose a finding of *Strickland* prejudice on the facts of this case.

Freeney admitted to killing fifteen-year-old prostitute Kirshalynne Jones and voluntarily provided details of his unspeakable acts. While pretending to give Ms. Jones money in a motel room, Freeney placed her in a chokehold until she passed out. Freeney tried to have sex with her for about fifteen minutes while she was unconscious, but he could not become aroused. After she had regained consciousness, Freeney repeatedly stabbed Ms. Jones with his keychain knife. Freeney forced Ms. Jones to perform oral sex on him until she had a "bleak look in her eyes."

Ms. Jones slowly again lost consciousness and died.  Freeney cleaned the room of any fingerprints or other evidence.  He then put Ms. Jones' body in the full bathtub to get rid of all evidence before leaving.  Freeney then "went back home and chilled out . . . ."  State Habeas Record at 139.

Freeney nearly killed again two days after killing Ms. Jones.  Freeney forced Kimberly Bolden, who was talking to her mother on her cell phone, into her apartment with a choke hold. Freeney began "beating [her] savagely."  Tr. Vol. 20 at 15.  After Freeney pushed Ms. Bolden to the floor, she offered to give him anything.  He told her "that he wanted to fuck" and asked if she "was going to give him some pussy."  Tr. Vol. 20 at 17.  As the two fought, Freeney choked her until he cut off her air supply.  Ms. Bolden's mother listened to the attack until her phone went dead.  Freeney wrestled around with Ms. Bolden until he stabbed her in the chest while saying "die bitch."  State Habeas Record at 145.  Freeney told the police that he stabbed her "to get some type of control on the situation."  State Habeas Record at 150.  Freeney's knife was knocked from his hand before Ms. Bolden lost consciousness.  Freeney went to the kitchen and picked up another knife.  When Ms. Boden regained consciousness, Freeney attacked again, this time biting and stabbing her until the knife snapped in two.  Freeney then demanded sex while hitting her.  Hearing noises outside, Freeney fled.  Ms. Bolden survived.

Around this time period, Freeney also raped two other young prostitutes before committing his final murder.  Freeney met prostitute Vicky Dean on the street four days after he had killed Ms. Jones.  They both went to his apartment, entering though a window.  Ms. Dean wanted payment immediately, but Freeney had no money.  When she wanted something to drink, Freeney went to the kitchen and brought Ms. Dean "some juice with . . . a sleeping aid" in it. State Habeas Record at 155-56.  He also brought a "cake knife" with a "flimsy blade."  State

Habeas Record at 156.  After she drank the juice and smoked cigarettes, Freeney asked Ms. Dean to lie on the bed so he could give her a massage.  When she took off her dress and lay down, Freeney stabbed her with a knife.  As she tried to wrestle, Freeney repeatedly stabbed her and said that she had to die. When Ms. Dean asked, "why me," Freeney "told her cause [he] like her."  State Habeas Record at 157.  While she was bleeding, Freeney had sex with Ms. Dean.  Freeney complained that was not as good as he thought it would be.  Freeney then knew that he could not let Ms. Dean go.  They wrestled again and, as she broke free, Freeney buried his knife in her left eye.  Ms. Dean begged Freeney, "Pull this knife out of me so I can die."  State Habeas Record at 162. Freeney left the apartment while she was still living.  The police found Ms. Dean's body in the grass outside Freeney's apartment building, with blood stains on the window sill through which she had presumably exited.  She was hospitalized for a month before she died.

Three days later the police arrested Freeney as he sat at a nearby bus stop negotiating prices with another prostitute.

Incarceration may have ended Freeney's ability to rape and kill prostitutes, but it did not end his aggression.  While jailed before trial, Freeney threatened guards both with physical and sexual violence.  He fought another inmate and possessed weapons.  He was a constant discipline problem.  The highly structured environment of prison could not repress his extremely violent tendencies.

With that background steeped in violence, the state habeas court was not unreasonable in its assessment of *Strickland* prejudice:

> [T]he State's case on punishment was overwhelming. [Freeney], essentially, tortured, raped and killed two women; attempted to do the same to a third; raped two more women; and was aggressive, violent and sexually abusive while incarcerated awaiting trial.

> Even if all of [Freeney's] postconviction evidence is credited there is not a reasonable probability of a different result.

State Habeas Record at 294. The Court, therefore, finds that the state court's denial of his *Strickland* claim was not contrary to, or an unreasonable application of, federal law. 28 U.S.C. § 2254(d)(1). The Court will deny Freeney's first two grounds for relief.

## II.   Texas' Mitigation Special Issue (claim three)

Freeney's third claim argues that the trial court should have instructed jurors on what would happen if they failed to reach a unanimous agreement on either special issue.[5]   Under Texas law, "[i]f the jury . . . is unable to answer any [special issue] issue . . . the court shall sentence the defendant to confinement in the institutional division of the Texas Department of Criminal Justice for life." TEX. CODE CRIM. PRO. art. 37.071 § 2(g).  Texas law, however, also mandates that "[t]he court, the attorney representing the state, the defendant, or the defendant's counsel may not inform a juror or a prospective juror of the effect of a failure of a jury to agree on [the special] issues[.]"  TEX. CODE CRIM. PRO. art. 37.071 § 2(a)(1). Freeney argues that "[t]he Texas prohibition against revealing the fact that a single holdout juror could cause the prosecution to result in a life sentence, rather than a mistrial followed by a new sentencing hearing, is clearly intended to prevent a minority of life giving jurors, or even a single juror, from

---

[5]      Notwithstanding the fact that he apparently exhausted the claims on direct appeal, Freeney makes the cursory argument that "all prior counsel provided the ineffective assistance of counsel for failure to raise the bases for relief in" claims three and four.  [Instrument No. 8 at 48, 54].  Freeney's perfunctory briefing on that issue does not provide an actionable basis for federal habeas corpus relief.  Nonetheless, Respondent contends that Freeney has not presented any ineffective-assistance-of-counsel component of his third and fourth claims to the state courts, rendering them unexhausted and procedurally barred.  For the reasons described in the text that follows above, federal precedent has conclusively rejected Freeney's underlying challenges to Texas' statutory capital sentencing procedure.  Respondent also argues that Freeney insufficiently exhausted the substance of his third claim. Regardless of procedural deficiencies, the specious constitutional underpinnings of Freeney's last two claims cannot command federal habeas relief.

actually exercising a veto of the majority's decision for death." [Instrument No. 8 at 47]. On that basis, Freeney argues that Texas law violates several constitutional provisions.

The Fifth Circuit has found that nothing in Supreme Court precedent requires Texas to inform a capital jury about the effect of any non-unanimous or holdout jurors. *See Turner v. Quarterman*, 481 F.3d 292, 300 (5th Cir. 2007); *Alexander v. Johnson*, 211 F.3d 895, 897 (5th Cir. 2000); *Webb v. Collins*, 2 F.3d 93, 95-96 (5th Cir. 1993). Accordingly, the Fifth Circuit has repeatedly held that indistinguishable claims require the creation of new constitutional law in violation of *Teague v. Lane*, 489 U.S. 288 (1989). *See Roach v. Quarterman*, 220 F. App'x 270, 276-77 (5th Cir. 2007); *Alexander*, 211 F.3d at 897; *Davis v. Scott*, 51 F.3d 457, 466 (5th Cir. 1995). Freeney does not show the applicability of any exception to the *Teague* doctrine or otherwise distinguish the Fifth Circuit's binding precedent.

In addition, the Fifth Circuit has also expressly found similar claims to be without merit. *See Alexander*, 211 F.3d at 897 n.5; *Miller v. Johnson*, 200 F.3d 274, 288-89 (5th Cir. 2000); *Jacobs v. Scott*, 31 F.3d 1319, 1328-29 (5th Cir. 1994). Finding support in the Supreme Court case of *Jones v. United States*, 527 U.S. 373 (1999), the Fifth Circuit has found no constitutional right to instruct a jury on potential deadlock. *See Alexander*, 211 F.3d at 897 n.5. The Court, therefore, denies Freeney's third ground for relief.

### III.   12-10 Rule (claim four)

Freeney's fourth claim argues that the trial court erred by instructing the jury on what is commonly known as the "10-12" or "12-10" Rule. *See Resendiz v. State*, 112 S.W.3d 541, 548 (Tex. Crim. App. 2003); *Prystash v. State*, 3 S.W.3d 522, 536 (Tex. Crim. App. 1999). Once the jury found Freeney guilty of capital murder, only two sentences were possible: life imprisonment

or death.  If the jury answered the future-dangerousness issue "yes" and found no mitigating circumstances, then Freeney would receive a death sentence.  If the jury answered the special issues otherwise, or they could not arrive at an answer, Freeney would receive a life sentence.  In compliance with the 12-10 rule, the trial court informed the jury that any answer to Texas's special issues which could result a death sentence must be unanimous, but that ten or more jurors would have to agree on any answer supporting a life sentence. Clerk's Record at 645.  Texas law, however, prevented the jury from being informed that failing to reach the required consensus on either special issue would still result in a life sentence.  TEX. CODE CRIM. PRO. art. 37.071(g).

Freeney claims that failing to explain the effect of a single juror's "no" answer to the mitigation special issue violates *Mills v. Maryland,* 486 U.S. 367 (1988).  In *Mills,* the Supreme Court "held invalid capital sentencing schemes that require juries to disregard mitigating *factors* not found unanimously." *Beard v. Banks,* 542 U.S. 406, 408 (2004) (emphasis added); *see also Smith v. Spisak,* 558 U.S. 139, 148 (2010); *McKoy v. North Carolina,* 494 U.S. 433, 439–440 (1990); *Druery v. Thaler,* 647 F.3d 535, 542–43 (5th Cir. 2011).  Because the Constitution mandates that jurors be able to consider mitigating evidence, *see Lockett v. Ohio,* 438 U.S. 586, 604 (1978), *Mills* prohibits sentencing instructions which preclude jurors "from considering any mitigating evidence unless all 12 jurors agreed on *the existence of a particular such circumstance." Mills,* 486 U.S. at 384 (emphasis added).

The Fifth Circuit has repeatedly held that Texas' 12–10 Rule does not run afoul of *Mills. See Allen v. Stephens*, 805 F.3d 617, 632 (5th Cir. 2015); *Holiday v. Stephens,* 587 F. App'x 767, 789 (5th Cir. 2014); *Reed v. Stephens,* 739 F.3d 753, 779 (5th Cir. 2014); *Parr v. Thaler,* 481 F. App'x 872, 878 (5th Cir 2012); *Druery v. Thaler,* 647 F.3d 535, 542–43 (5th Cir. 2011); *Greer v. Thaler,* 380 F. App'x 373, 389 (5th Cir. 2010).  The Fifth Circuit holds that "the instruction at

issue is wholly dissimilar to that involved in *Mills,*" *Woods v. Johnson,* 75 F.3d 1017, 1036 (5th Cir. 1996), because "all jurors can take into account any mitigating circumstance." *Jacobs,* 31 F.3d at 1329; *see also Spisak,* 558 U.S. at 147–48 (distinguishing between instructions requiring unanimity in an ultimate finding of mitigating circumstances from unanimity in finding the existence of a particular circumstance). Unlike in *Mills*, "the instructions did not say that the jury must determine the existence of each individual mitigating factor unanimously." *Spisak,* 558 U.S. at 148.  In fact, the trial court's instructions explicitly told jurors that they "need not agree on what particular evidence supports an affirmative finding on Special Issue No. 2." Clerk's Record at 645. Given that *Mills* does not condemn sentencing instructions such as those given in this case, granting habeas relief would require the creation of new constitutional law in violation of the non-retroactivity principle from *Teague v. Lane. See Druery,* 647 F.3d at 542–45 (citing numerous Fifth Circuit cases).  Binding federal precedent rejects the merits of Freeney's 12-10 claim.

## CERTIFICATE OF APPEALABILITY

AEDPA bars appellate review of a habeas petition unless a district or circuit court certifies specific issues for appeal.  *See* 28 U.S.C. § 2253(c); FED.R.APP.P. Rule 22(b).  Even though Freeney has not sought a Certificate of Appealability ("COA"), this Court can consider the issue *sua sponte.  See Alexander*, 211 F.3d at 898.  The Court must address whether the circumstances justify an appeal before issuing a final judgment.  *See* Rule 11, Rules Governing Section 2254 Cases in the United States District Courts.

A COA may issue when "[a petitioner] has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2); *see also Slack v. McDaniel*, 529 U.S. 473, 484

(2000).  Settled precedent forecloses relief on Freeney's claims.  Because Freeney has not shown under the appropriate standard that any issue deserves appellate review, this Court will not certify any of his habeas claims for consideration by the Court of Appeals for the Fifth Circuit.

## CONCLUSION

For the reasons described above, the Court finds that Freeney has not shown an entitlement to federal habeas relief.  This Court **grants** Respondent's motion for summary judgment, **denies** Freeney's petition, and **dismisses** this case **with prejudice**.  The Court **denies** all remaining requests for relief.  No Certificate of Appealability will issue in this case.

The Clerk will deliver a copy of this Order to the parties.

SIGNED at Houston, Texas, this 27th day of January, 2016.

MELINDA HARMON
UNITED STATES DISTRICT JUDGE